**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHANE MICHAEL STUDIER,

               Petitioner,                     Case Number: 17-10550
                                             Honorable Linda V. Parker

v.

WILLIE SMITH,

               Respondent.

_____/

### OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS; (2) DENYING CERTIFICATE OF APPEALABILITY; AND (3) GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Shane Michael Studier is presently in the custody of the Michigan Department of Corrections pursuant to convictions for first-degree home invasion, assault with intent to do great bodily harm less than murder, domestic violence, unlawful imprisonment and torture. He raises six claims for relief. The Court will deny the petition because Petitioner's first five claims are without merit and his sixth claim is abandoned. The Court will deny a certificate of appealability as to all claims and grant permission to appeal in forma pauperis.

# BACKGROUND

Petitioner's convictions arise from the assault of his estranged wife. The Michigan Court of Appeals set forth the following relevant facts in its decision affirming Petitioner's convictions:

> Defendant's convictions arise from a series of events beginning early in the morning and continuing into the early afternoon of October 15, 2011. At approximately 5:30 a.m., defendant arrived at the apartment of his estranged wife (the "victim"). Defendant had a history of domestic violence against the victim. The victim refused to let defendant inside her apartment, but defendant kicked open the door and forced his way inside. Once inside the apartment, defendant repeatedly assaulted the victim until they left the apartment around dawn. He repeatedly struck her in the face, choked her with his hands, kicked her in the groin area, pushed her to the floor, and kicked her in the face. He also threatened her with both a steak knife and a two-pronged fork, holding both objects to her throat and threatening to kill her. Throughout this time, defendant verbally abused the victim, called her a "whore," and blamed her for the problems in the couple's relationship.
>
> Defendant eventually told the victim that he was not going to work that day and was taking her to his mother's house where he also lived, because he did not want her to call the police. The victim collected her 10–month–old child and walked with defendant to his truck. She did not attempt to run from him at this time, explaining that defendant would catch her and she was afraid that defendant would hurt her more. When defendant stopped at a gas station, the victim asked defendant to buy her some water so she could take medication for her pain. She did not try to leave the truck or summon help while at the gas station, explaining that she did not have time to retrieve her 10–month–old child from the vehicle before defendant could get to her, and she was afraid of defendant and did not want to do anything to provoke him more. Defendant arrived at his mother's house and brought the victim to his bedroom. When the victim heard defendant's mother, Diana Gundlach, ask defendant where the victim was, the victim did not attempt to call out for help. The victim eventually fell asleep in defendant's bedroom.

Gundlach left for work, but suspected that something was wrong, so she went to the police station and asked the police to check her house. When the police arrived, they discovered the victim inside defendant's bedroom. She had visible injuries and was transported to a hospital for treatment.

*People v. Studier*, 2015 WL 447408, *1-*2 (Mich. Ct. App. Feb. 3, 2015).

Petitioner was convicted by a jury in St. Clair County Circuit Court of first-degree home invasion (Mich. Comp. Laws § 750.110a(2)), unlawful imprisonment (Mich. Comp. Laws § 750.349b), assault with intent to do great bodily harm less than murder (Mich. Comp. Laws § 750.84), domestic violence (third offense) (Mich. Comp. Laws § 750.81(4)), and torture (Mich. Comp. Laws § 750.85). On June 20, 2013, the trial court sentenced him as a fourth habitual offender to concurrent prison terms of 26 years and 8 months to 80 years for the unlawful imprisonment and assault with intent to do great bodily harm convictions, 7 to 15 years for the domestic violence conviction, and 50 to 80 years for the torture conviction, to be served consecutively to an additional prison term of 26 years and 8 months to 80 years for the home invasion conviction. *See Studier*, 2015 WL 447408 at *1-*2.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising five claims through appointed counsel and four claims in a pro per supplemental brief. The Michigan Court of Appeals affirmed Petitioner's convictions and sentences. *Id.*

Petitioner sought leave to appeal in the Michigan Supreme Court, raising the same claims raised in the court of appeals and three additional claims. In lieu of granting leave to appeal, the Michigan Supreme Court reversed in part the judgment of the Michigan Court of Appeals and remanded to the trial court to determine whether the court would have imposed a materially different sentence under the sentencing procedure described in *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015). *People v. Studier*, 871 N.W.2d 524 (Mich. 2015). In all other respects, the Michigan Supreme Court denied leave to appeal.[1] *Id.*

Petitioner then filed the pending petition for a writ of habeas. He raises these claims:

I.     The Defendant was denied his right to a neutral trial judge.

II.     The Defendant was denied his right to a fair trial and due process when the jury was exposed to the Defendant in shackles.

III.     The presumption of vindictiveness applies to the Defendant's sentence.

IV.     Error denying adjournment.

V.     Failure to conduct a competency hearing.

VI.     Ineffective assistance of trial and appellate counsel.

---

[1] It is unclear from the record before the Court whether the trial court has yet undertaken the review ordered by the Michigan Supreme Court. Because Petitioner does not raise a *Lockridge*-related claim, the Court may nevertheless proceed to the merits.

## LEGAL STANDARD

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,

imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law, or if the state court decides a case differently than the

Supreme Court has on a set of materially indistinguishable facts.  *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when

"a state-court decision unreasonably applies the law of [the Supreme Court] to the

facts of a prisoner's case."  *Id.* at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id.*

Moreover, for claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## ANALYSIS

### Claim One:  Judicial Bias

In his first claim for relief, Petitioner argues that he was denied his constitutional right to a fair trial before an unbiased judge.  He claims that the trial judge's comments about defense counsel's cross-examination of the victim, her pointed criticism of defense counsel's handling of proposed jury instructions, and the perceived disparate treatment of the prosecution and defense evidenced a bias against the defense.

"[T]he Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (internal quotation marks and citation omitted).  An impartial judge is a necessary component of a fair trial.  *In re Murchison*, 349 U.S. 133, 136 (1955).  The Supreme Court established the standard for assessing claims of judicial bias in *Liteky v. United States*, 510 U.S. 540 (1994).  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555.  A judge's remarks that are "critical or disapproving of, or even hostile to, counsel, the parties,

or their cases, ordinarily do not support a bias or partiality challenge." *Id*. Even a judge's expressions of "impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not, standing alone, establish a due process violation. *Id.* at 555-56.

Petitioner moved for a mistrial three times over the course of the trial based upon claimed judicial bias. First, on the third day of trial, the trial judge admonished defense counsel regarding his cross-examination of the victim. Defense counsel asked the victim whether, when she was pulled over by a police officer in February 2010, she lied about the status of her driver's license. (ECF No. 5-17 at Pg. ID 533.) The prosecutor immediately objected and the jury was excused. During the ensuing colloquy, the trial court said that whether the witness would assert her Fifth Amendment privilege was a matter to be discussed outside the jury's presence. (The witness did assert her Fifth Amendment privilege.) The judge then expressed to defense counsel her "concern[]" that he intentionally asked the victim this question in the jury's presence so the victim would invoke her Fifth Amendment privilege in front of the jury. The judge stated, "I'm getting the feeling it was a setup and I'm really not happy about that." (*Id.* at Pg. ID 539.) The court denied Petitioner's motion for a mistrial.

Second, on the fourth day of trial, defense counsel moved for a mistrial because the trial court repeatedly sighed in a manner apparent to the jury when defense counsel made objections. (ECF No. 5-18 at Pg. ID 575.) The trial court also frequently interrupted defense counsel's cross-examinations, but did not similarly interrupt the prosecutor. (*Id.*) The trial court denied the motion.

Lastly, on the fifth and final day of trial, Petitioner moved for a mistrial in connection with email communications involving defense counsel, the prosecutor, and the trial court regarding the proposed jury instructions. A paper copy of the email exchanges is not part of the record, but defense counsel quoted portions of the emails on the last day of trial as part of his motion to disqualify the trial judge and for a mistrial. The emails show several communications among the parties the previous day (a day the trial judge set aside for other, unrelated matters). The gist of these emails is that the court received the proposed instructions and objections late in the afternoon, at approximately 4:30. Minutes after receiving the proposed instructions and objections, the trial court emailed the parties to express dissatisfaction that the submission was late. She informed the parties she did not intend to spend her entire evening reviewing the instructions and that it was too late in the day to direct the jury to come in later the following day. (ECF No. 5-19 at Pg. ID 656-57.) Minutes later, the trial court sent another email to the parties which stated, in part:

I have not reviewed the instructions . . . which were sent to me this afternoon while I was in the courtroom. I do, however, find this message highly inappropriate. Please do not [ ] email me any other messages of this nature. Given the lateness of which I was presented the Defendant's proposed instructions I really cannot be bothered with chest beating banter such as this.

(*Id.* at Pg. ID 1212.)[2]

Defense counsel argues that the email exchange, the trial court's sighs, and her comments (outside the jury's presence) to defense counsel that she did not like his "grandstanding" show her bias against Petitioner and/or defense counsel. (ECF No. 5-18 at Pg. ID 629.)

The Michigan Court of Appeals denied relief on this claim, explaining:

The trial court's e-mails criticizing defense counsel reflect the court's frustration that the proposed jury instructions were submitted at an inconvenient time, but comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality. *Jackson*, 292 Mich. App. at 598. The trial court's explanation that it was frustrated with the delay in receiving the proposed instructions is consistent with the context in which the e-mails were exchanged. The court did not vent its frustration in the presence of the jury. These comments are insufficient to overcome the presumption of impartiality.

Similarly, the trial court's comment that defense counsel had apparently "set up" the question about the victim's alleged illegal conduct before the trial court addressed the Fifth Amendment issue, and its comment that defense counsel was engaging in "grandstanding" and taking "marching orders" from defendant or his family, revealed exasperation

---

[2] The Court cannot discern which message in particular the trial judge found "highly inappropriate." It is clear from the transcript that defense counsel understood this comment to be directed at his email and not the prosecutor's.

that defense counsel was pushing boundaries instead of complying in good faith with the court's procedures and rulings. A judge's opinions or judicial rulings are not valid grounds for alleging bias "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Id.* (citations and internal quotations omitted). The comments here, considered in context, do not rise to a level of deep-seated bias or antagonism against defense counsel or defendant. The court did not abuse its discretion by finding that there was no factual basis for defendant's motion for disqualification.

Defendant argues that if he failed to establish actual bias, judicial disqualification was warranted on the ground that the court gave the appearance of bias. He relies on *Caperton v. Massey*, 556 U.S. 868 (2009), the case cited in M.C.R. 2.003(C)(1)(b). The circumstances of this case are not comparable to *Caperton*, which involved a party's substantial monetary contributions to a judge's election campaign. Unlike in *Caperton*, there was no evidence of extra-judicial influences that might affect the trial judge's ability to act impartially, or would give rise to an appearance of bias or impropriety. The trial court's various remarks, considered in the context in which they were made, were understandable reflections on defense counsel's tactics during trial. Most of the challenged conduct occurred outside the jury's presence. Defendant has not demonstrated that his due process rights were violated by judicial bias or partiality.

*Studier*, 2015 WL 447408 at *3-*4.

The trial court's email exchange with the attorneys, while arguably curt and short-tempered, did not necessarily appear aimed at defense counsel in particular and was a direct response to the parties' failure to provide timely proposed instructions. "A terse or frustrated exchange" does not constitute bias so long as it does not reveal an underlying bias. *Ajanel-Gonzalez v. Sessions*, 685 Fed. App'x

419, 428 (6th Cir. 2017). As such, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

In addition, the trial judge's suspicion that defense counsel intended to raise the Fifth Amendment issue in front of the jury did not render the trial unfair. The court's suspicion, which was not expressed in front of the jury, appears to touch on the goal of ensuring the trial was conducted in an orderly fashion. And, the court's concern that the defendant's family was directing the course of the defense was similarly aimed at controlling the proceeding. It appears the court was concerned that defense counsel was abiding by the directives of his client's family rather than the rules of court. Here, the trial court's interactions with defense counsel did not demonstrate a deep-seated antagonism against Petitioner or defense counsel.

Further, the state court did not conflict with clearly established federal law in rejecting Petitioner's claim that disqualification was required on the mere *appearance* of bias. Due process may require disqualification even when a judge "ha[s] no actual bias.'" *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (alteration in original) (citation omitted). The Court must inquire whether "considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable." *Id.* Here, it was not unreasonable for the Michigan Court of Appeals

to conclude that the trial judge's actions did not create a high risk of bias.  The Court denies relief on this claim.[3]

Claim Two:  Petitioner in Restraints

Next, Petitioner seeks habeas relief on the ground that jurors may have seen him in handcuffs while he was escorted into the courthouse.  He maintains that the state court's decision denying this claim was an unreasonable application of the Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622 (2005).

On the second day of trial, the trial court was informed that certain jurors may have seen Petitioner in the courthouse hallway during the lunch break.  One of the officers transporting Petitioner informed the court that, when he saw several jurors turn into the hallway walking toward Petitioner, he situated his body to attempt to block their view of Petitioner's handcuffs.  (ECF No. 5-16 at Pg. ID

---

[3] "Because it is the decision of the state court, not its reasoning, to which AEDPA deference applies," it does not matter that the Michigan Court of Appeals' opinion does not explicitly discuss how the trial judge's alleged sighs factored into its analysis of whether Petitioner's due process rights were violated by judicial bias or partiality.  *Holland v. Rivard*, 800 F.3d 224, 235-36 (6th Cir. 2015) ("Habeas relief may not be granted unless the state court adjudication '*resulted in a decision* that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'  28 U.S.C. § 2254(d)(1) (emphasis added).  'In assessing the reasonableness of the state court's application of federal law, . . . federal courts are to review the result that the state court reached, not whether [its decision] [was] well reasoned.'").

13

449.) He did not know if the jurors saw the handcuffs. *Id.* The trial court questioned the jury panel about any "encounters" they may have had with Petitioner during the break. (*Id.* at Pg. ID 454.) Five jurors said that they saw Petitioner in the hallway. The court asked these jurors whether they saw anything that caused them any concern. (*Id.*) All five jurors said that they had not. One juror said it was so minimal that she would not even call it an encounter. (*Id.* at Pg. ID 455.) The court denied Petitioner's motion for a mistrial and proceeded with trial.

The Michigan Court of Appeals denied this claim on two grounds. First, the state court held that the cited portion of the record did not establish that any jurors *actually* viewed Petitioner in restraints. *Studier*, 2015 WL 447408 at *5. Second, the Michigan Court of Appeals found no error because, even assuming that Petitioner was seen in restraints, the incident was brief and inadvertent and occurred during transportation from the court. *Id.*

In *Deck*, the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. at 629. *Deck,* however, "concerned only visible restraints at trial. The Supreme Court was careful to repeat this limitation throughout its opinion." *Mendoza v. Berghuis*, 544 F.3d 650,

654 (6th Cir. 2008). In *Earhart v. Kontech*, the Sixth Circuit stated that "[t]he fact that several jurors saw [the defendant] in shackles as officers transported him to the courtroom was irrelevant because restraining a defendant in the courtroom, and '[r]estraining him during transport there, are two very different things.'" 589 F.3d 337, 349 n.4 (6th Cir. 2009) (quoting *Mendoza*, 544 F.3d at 655). "[I]t is *reasonable* for law enforcement officers to transport custodial criminal defendants to and from courthouses across the country with restraints. . . . And jurors may well *expect* criminal defendants—at least ones charged with the kind of conduct at issue here [assault with intent to commit murder]—to be restrained during transport to the courtroom." *Id.* (internal quotation marks omitted).

Petitioner has not shown that jurors saw him in handcuffs. *Earhart*, 589 F.3d at 349 (observing no violation of clearly established federal law where restraint not visible); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) (finding no violation of clearly established federal law where "no evidence that the jury actually saw [the restraint]"). Even if certain jurors did see him in handcuffs, he was being transported from the courtroom. The Supreme Court has not held that a defendant's constitutional rights are violated when jurors see a defendant shackled during transport. Therefore, the Michigan Court of Appeals' decision is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

15

<u>Claim Three: Vindictiveness at Sentencing</u>

Petitioner argues that habeas relief is warranted because the trial court

increased his sentence to punish him for exercising his right to a jury trial.

Petitioner originally pleaded guilty, as a fourth habitual offender, to domestic

violence, first-degree home invasion, unlawful imprisonment, and assault with

intent to inflict great bodily harm less than murder.  In exchange for the plea, the

torture charge would be dismissed, the prosecutor would seek a minimum sentence

of no more than 15 years, and the prosecutor would not seek consecutive

sentencing.  The trial court specifically declined to enter into a *Cobbs* agreement.[4]

At sentencing, the trial court stated it would not limit Petitioner's sentence to

15 years.  She would instead accept the minimum sentence recommendation of the

probation department with no consecutive sentencing for the home invasion.[5]

---

[4]  In *People v. Cobbs*, 505 N.W.2d 208 (1993), the Michigan Supreme Court
authorized a plea agreement by which a judge indicates a preliminarily non-
binding sentence, but if the defendant subsequently pleads guilty and the judge
determines that the sentence must exceed the preliminary evaluation, the defendant
has an absolute right to withdraw the plea.

[5]  It is not apparent from the record before the Court what the probation
department's recommendation was.  At the time of actual sentencing, defense
counsel stated that the court was prepared to sentence Petitioner to a minimum
sentence of 20 years at the original sentencing.  (ECF No. 5-20 at Pg. ID 708.)
Neither the prosecutor nor the trial court disagreed with that statement.
Regardless, the Court need not determine the exact number of years the trial court
would have imposed had Petitioner not withdrawn his guilty plea.  Respondent

16

(ECF No. 5-12 at Pg. ID 319-21.)  The court offered Petitioner the opportunity to withdraw his plea.  Petitioner opted to withdraw his plea despite counsel's vehement and repeated advice that he not do so.  Following his conviction, Petitioner was sentenced to concurrent sentences of 26 years and 8 months to 80 years for the unlawful imprisonment and assault convictions; 7 to 15 years for the domestic violence conviction; and 50 to 80 years for the torture conviction; to be served consecutively to 26 years and 8 months to 80 years for the home invasion conviction.

A sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial or the right to appeal.  *See Wasman v. United States*, 468 U.S. 559, 568 (1984). When the same judge applies a greater sentence after a defendant successfully appeals a first conviction, the presumption arises that the sentence is vindictive. *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969).  To rebut that presumption, there must be objective information in the record justifying the increased sentence. *United States v. Goodwin*, 457 U.S. 368, 374 (1982).  "[T]he evil the [presumption of vindictiveness] sought to prevent" was not the imposition of "enlarged sentences after a new trial" but "vindictiveness of a sentencing judge."  *Texas v.*

_____

does not dispute that the sentence ultimately imposed was significantly greater and included a consecutive sentence.

17

*McCullough*, 475 U.S. 134, 139 (1986).  Thus, the presumption applies only in circumstances where there is a "reasonable likelihood" that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority. *Alabama v. Smith*, 490 U.S. 794, 799 (1989).

The presumption of vindictiveness, however, does not arise when the first sentence was based upon a guilty plea and the second follows a trial because a sentencing judge has considerably more relevant sentencing information after trial than is generally available when the defendant pleads guilty.  *Id.*  During trial, "the judge may gather a fuller appreciation of the nature and extent of the crimes charged."  *Id.*  In addition, a "defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation."  *Id.*

The Michigan Court of Appeals found no evidence of vindictiveness.  The Court of Appeals quoted at length the sentencing court's explanation for the sentence and found it reasonably based upon additional facts gleaned from the lengthy trial.  *Studier*, 2015 WL 447408 at *9.  Indeed, the sentencing court provided extensive justification for the sentence imposed.  The court explained that she learned new information during the trial, including the "true brutality" of Petitioner's crimes.  (ECF No. 5-20 at Pg. ID 714.)  The court determined "without reservation that [the attack] was more brutal than I thought.  Much more.  It was chilling."  (*Id.*)  The judge also noted that she heard multiple times from numerous

individuals who had contact with Petitioner over the years that they had done everything they could for him and nothing helped. (*Id.*) Under these circumstances, there is no evidence of actual vindictiveness and the Michigan Court of Appeals' rejection of this claim was a reasonable application of clearly established federal law.

Claim Four: Denial of Motion for Adjournment

Petitioner next argues that he was denied his right to counsel of choice when the trial court denied his motion for an adjournment. On direct appeal, Petitioner argued that the denial of his motion violated his constitutional right to counsel of choice. (ECF No. 5-21 at Pg. ID 869.) But the Michigan Court of Appeals specifically (and incorrectly) held that Petitioner "did not assert a constitutional right." *Studier*, 2015 WL 447408 at *10. Because the Michigan Court of Appeals failed to recognize Petitioner's claim as one touching on a constitutional right, the Court reviews this claim *de novo*. *People v. Nutt*, 677 N.W.2d 1 (Mich. 2004).

The Sixth Amendment protects "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). On March 13, 2013, after Petitioner withdrew his guilty plea, defense counsel immediately made a motion to withdraw based upon a breakdown of the attorney-client relationship. (ECF No. 5-12 at Pg. ID 325-334.) Notwithstanding Petitioner's claim that there was no breakdown in

19

the relationship, (*id.* at Pg. ID 330, 333), on the same day, the court granted

defense counsel's motion to withdraw, (*id*. at Pg. ID 334). The court then set a

trial date for approximately 40 days out and stated that Petitioner was responsible

for securing new counsel. (*Id.* at 334-36.) Petitioner retained a new attorney, Neil

Rockind, on March 19, 2013. A week later, Rockind asked the court to adjourn the

trial date from April 23, 2013 to the first week in June, citing the complexity of the

case. The trial court denied the motion. (ECF No. 5-13.)

A criminal defendant has a due process right to be afforded a reasonable

time and opportunity to secure counsel. *Powell v. Alabama*, 287 U.S. 45, 52-53,

(1932). But where—as here—a petitioner was represented by the attorney he

retained, he has not shown that he was denied his right to counsel of choice.

Moreover, "[n]ot every restriction on counsel's time or opportunity to

investigate or to consult with his client or otherwise to prepare for trial violates a

defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11,

(1983) (citation omitted). "Trial judges necessarily require a great deal of latitude

in scheduling trials. . . . Consequently, broad discretion must be granted trial courts

on matters of continuances; only an unreasoning and arbitrary 'insistence upon

expeditiousness in the face of a justifiable request for delay'" violates the right to

the assistance of counsel. *Id.* at 11-12. As the Sixth Circuit has explained, "[t]o

demonstrate reversible error, the defendant must show that the denial resulted in

actual prejudice to his defense." *Landrum v. Mitchell*, 625 F.3d 905, 927 (6th Cir. 2010) (citing *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997)). "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense." *Id.* (citing *Powell*, 332 F.3d at 396).

Here, Petitioner has not shown that he made a "justifiable request" for adjournment. Petitioner contends that the decision not to adjourn the trial "directly affected defenses [*sic*] ability to research, investigate and prepare for trial." (ECF No. 5-21 at Pg. ID 870.) As in *Beuke v. Houk*, "merely stressing that [Petitioner] had 'inadequate' or 'insufficient' time to prepare" does not constitute the requisite identification of "a *particular* reason why the court should have granted [the] continuance." 537 F.3d 618, 641 (6th Cir. 2008) (emphasis added). Indeed, "[s]uch generalized objections do not constitute a justifiable request for a continuance" and thus cannot support a claim alleging violation of right to counsel. *Id.* at 641-42.

Petitioner also has not shown that he was prejudiced by the trial court's case management. Petitioner points out that defense counsel "deci[ded] not to put [Petitioner] on the stand to testify." (ECF No. 5-21 at Pg. ID 870.) But Petitioner does not explain and it is unclear from the record how additional time would have

impacted this decision—a decision which may have been a strategic choice and not a result of the trial court's refusal to delay the trial.

The Court concludes the decision not to adjourn the trial in this case was not contrary to or an unreasonable application of clearly established law.

Claim Five:  Competency Hearing

The day before trial commenced, Petitioner cut his neck in an apparent suicide attempt.  The following day, the trial court denied defense counsel's motion for a forensic evaluation to determine Petitioner's competency to stand trial.  (ECF No. 5-15 at Pg. ID 351-53.)  Petitioner argues that this violated the Due Process Clause.

A criminal defendant has a constitutional due process right not to be tried or convicted while incompetent to stand trial.  *See Pate v. Robinson*, 383 U.S. 375 (1966).  To be adjudged competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).  Due process requires a trial court to conduct a competency hearing "where there is substantial evidence that a defendant is incompetent."  *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006).  In assessing the necessity of a competency evaluation, a court may consider these factors: "a defendant's irrational behavior, his demeanor

at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975).

In this case, the trial court referred Petitioner for a competency evaluation during pre-trial proceedings after defense counsel reported Petitioner had made a suicide attempt and was hearing voices. Petitioner was found competent to stand trial. The Michigan Court of Appeals held that the trial court's denial of Petitioner's motion for a second referral did not violate due process:

> Defense counsel later requested a second competency evaluation after another suicide attempt by defendant. The suicide attempt was the only factual basis for the request. Although a suicide attempt reflects a desire for death, it does not equate with an inability to understand the proceedings or assist in a defense. In light of the previous determination that defendant was competent to stand trial, and the absence of any further showing that defendant's mental condition prevented him from understanding the nature and object of the proceedings against him, or assisting in his defense, the trial court did not abuse its discretion by denying defendant's request for a second competency evaluation.

*Studier*, 2015 WL 447408 at *11.

In *Drope*, the Supreme court held that "a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion.'" 420 U.S. at 181 n.16 (quoting Greenberg, Involuntary Psychiatric Commitments to Prevent Suicide, 49 N.Y.U. L. Rev. 227, 236 (1974)); *see also Carter v. Bogan*, 900 F.3d 754, 771-72 (6th Cir. 2018), *cert. denied sub nom. Carter v. Jackson-Mitchell*, 140 S. Ct. 56, (2019)

(explaining that "not every suicidal person . . . is incompetent to stand trial"). At the time of the forensic psychiatry evaluation, the forensics examiner knew that, in March 2012 while incarcerated at the St. Clair County Jail, Petitioner voiced suicidal ideation and had cut his forearm with a razor blade. (ECF No. 5-6 at Pg. ID 250.) The forensics examiner, nevertheless, concluded that Petitioner was competent to stand trial. As the trial court acknowledged, while Petitioner's suicide attempt might fairly be characterized as an "irrational act," it did not render him incompetent to stand trial. (ECF No. 5-15 at Pg. ID 353.) Petitioner presented no evidence that he did not understand the legal process or was incapable of assisting in his defense.

The Court considers the Michigan Court of Appeals' decision in light of all the information before the Court, including the absence of any evidence that Petitioner could not assist in his defense. The state court's decision that the suicide attempt was insufficient to require a second competency evaluation was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner is not entitled to federal habeas relief on this claim.

<u>Claim Six:  Ineffective Assistance of Trial and Appellate Counsel</u>

Finally, the petition "protectively" raises ineffective assistance of trial and appellate counsel claims: "[c]ounsel is continuing to investigate and is protectively pleading an unexhausted claim" that counsel was ineffective in "spontaneously"

advising Petitioner to withdraw his plea and risk a jury trial and that appellate counsel was ineffective in failing to raise this claim. (ECF No. 1 at Pg. ID 20-21.) Petitioner represented that, within 60 days from the filing of the petition, he would either move for a stay to allow him to exhaust these claims or withdraw the claims. He has done neither. These claims are therefore abandoned. *Barnes v. Warden, Ross Correctional Facility,* 2019 WL 5576345, *1, n.1 (6th Cir. Sept. 16, 2019) (where petitioner listed several additional ineffective assistance claims but made no arguments in support, the district court "properly deemed them abandoned").

## Remaining Issues

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability]." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal quotation marks and citations omitted).

The Court denies a certificate of appealability as to Petitioner's claims. The Court grants Petitioner leave to appeal in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

### CONCLUSION

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner may proceed in forma pauperis on appeal. 28 U.S.C. § 1915(a)(3).

**IT IS SO ORDERED.**

s/Linda V. Parker
LINDA V. PARKER
UNITED STATES DISTRICT JUDGE

Dated: March 31, 2020